# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**DALE M. JONES,**

          **Plaintiff,**              **CIVIL ACTION NO. 2:06-CV-15491**

    **vs.**

                                    **DISTRICT JUDGE GERALD E. ROSEN**

**COMMISSIONER OF**                **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

          **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:** Both Defendant and Plaintiff's Motions for Summary Judgment should

be DENIED, and the instant case remanded for further proceedings consistent with this report and

recommendation.

***

Plaintiff filed an application for Disability Insurance Benefits on December 15, 2003,

alleging that he had been disabled and unable to work since September 12, 2003 due to bones spurs,

arthritis in the neck and back, scar tissue in the neck and back and high cholesterol. (TR 49). The

Social Security Administration denied benefits (TR 31). A requested *de novo* hearing was held on

December 15, 2005 before Administrative Law Judge (ALJ) Henry Perez, Jr., who subsequently

found that the claimant was not under a disability at any time from September 13, 2003 through the

date of the decision. (TR 21). The Appeals Council declined to review the ALJ's decision and

Plaintiff commenced the instant action for judicial review. The parties have filed Motions For

Summary Judgment and the issue for review is whether Defendant's denial of benefits is supported

by substantial evidence on the record.

Plaintiff was fifty-four years old at the time of the administrative hearing, has a high school education and an associates degree in law enforcement, and previously worked as a police officer and field custody investigator. (TR 202-03). Plaintiff has not engaged in any substantial gainful activity since September 12, 2003, the date Plaintiff alleges he first became unable to work because of his condition. (TR 49).

Plaintiff alleges that his symptoms first began to bother him in January 1999. (TR 49, 204). Plaintiff testified that he initially thought he had a rotator cuff injury for which he sought treatment through his family physician. (TR 204). Plaintiff testified that he went through preliminary tests, x-rays and physical therapy. (TR 204). He was later referred to another doctor who told him that the problems were likely in his neck and not his arm. (TR 204). Plaintiff had cervical surgery in August 1999. (TR 204). Plaintiff further testified that at the time he was suffering numbness and aching in his arms and had "loss of sleep, inability to concentrate, poor attendance at work." (TR 204). He claimed to have undergone a second surgery in June 2000 and returned to work eight weeks later. (TR 204). He stated that he was "unable to concentrate at work" and had doctor's orders to use a special high-back chair to rest his neck. (TR 205). He testified that he "had a hard time keeping one position such as standing." (TR 205). The pain interferes with his driving, his ability to sleep and concentrate and his ability to focus on the matters at hand. (TR 205). He further stated that even his reading was affected because he could not comprehend some of the things he read because he had to "put things in different order due to the fact that" he had ongoing pain and could not stay in one position for very long. (TR 205). Plaintiff testified that he had numerous physical therapy sessions and had tried acupuncture and medications before being referred to a chronic pain institute for treatment. (TR 205). He claimed that the medication he was taking was

starting to have an effect on his pancreas and liver. (TR 205). Plaintiff stated that he underwent a series of epidurals and a medical pump was eventually installed to provide him with a constant drip of pain medication. (TR 206). Plaintiff had problems with the first pump and it was subsequently removed. (TR 206). A second pump was successfully installed. (TR 206).

Plaintiff further testified that his doctor restricted him to lifting no more than ten pounds "if possible." (TR 206). Plaintiff is able to take care of his own personal needs and hygiene and participates in some restricted housework including emptying the dishwasher, dusting, doing light loads of laundry, and some meal preparation. (TR 206). Plaintiff stated that he can make small trips to the grocery store, but it takes a "toll" on him to pick up a full load of groceries, remove them from the cart to his trunk, unload them from the trunk and bring them into the house. (TR 206). He also stated that he has difficulty driving because he cannot turn his head very much, so parking and backing up can be a problem. (TR 207). He used to participate in archery, hunting and fishing. (TR 207). He stopped participating in archery because he was no longer able to pull a bow, and he has cut back on hunting and fishing. (TR 207). He further stated that he is not supposed to be on a ladder and going up and down stairs is a problem for him. (TR 207-08). He testified that sitting used to be limited to an hour or two, but now with the placement of the medical pump, he is limited to approximately one hour. (TR 208). He testified that he can stand for an hour and a half. (TR 208). He complained of disrupted sleep due to pain on one side of his body and the medical pump being installed on the other side. (TR 209). He stated that his doctor also gave him a restriction limiting his bending and stooping. (TR 209).

Plaintiff testified that as a result of the fusions he has had, he still had problems with pain and numbness in his arms. (TR 211). There are times when he loses feeling in his thumb and first two fingers and it makes tasks such as writing and using a car key difficult. (TR 211).

In an undated Disability Report Plaintiff states that in his job as a field investigator, he lifted briefcases and files. The heaviest weight he lifted in this position was approximately 20 pounds. (TR 50). He indicated that he "frequently" lifted under ten pounds in this job. (TR 50). He also indicated that he walked for a total of approximately 1 ½ hours per day, stood approximately 1 ½ hours per day, sat approximately four hours per day and wrote, typed or handled small objects approximately two to three hours per day. (TR 50). In a January 2004 Michigan Disability Determination Service Function Report, Plaintiff indicated that his hobbies and interests include hunting, fishing, archery, racquetball, softball and watching NASCAR. (TR 65). He further indicated that since his conditions began he is "unable to hunt/fish any length of time" and unable to participate in archery, softball and racquetball. (TR 65).

**MEDICAL EVIDENCE**

From July 26, 2001 through June 4, 2003 Plaintiff was treated by Jagmohan Sharma, M.D. at David S. Weingarden, M.D. & Associates, P.C., Physical Medicine & Rehabilitation. (TR 96, 98, 113). During this period, Plaintiff was treated for chronic neck pain, chronic back pain (noted May 27, 2003), right C6 radiculopathy, cervical radiculopathy, lumbar radiculopthy (although noted June 4, 2003 that "there is not electrodiagnostic evidence of lumbosacral radiculopathy), degenerative disc disease of the cervical spine, noting status post anterior corpectomy and fusion of C3-4 and C5-6 levels, hypercholesterolemia, and sometimes anxiety and/or depression. (TR 96-114). Treatments during this period included epidural steroid injections, pain medication and home

exercises. (TR 96-114). The notes indicate that his symptoms and relief from pain improved due to the treatments, he was generally able to remain active in "normal activities" during this time and he continued to work without restrictions. However, by September 12, 2002 Plaintiff had two neck surgeries and it was noted that he was not successful with nonoperative treatment including physical therapy, anti-inflammatory medications, narcotic and non-narcotic medications, anti-epileptic medications and a TENS unit. (TR 114). However, Plaintiff showed 20% improvement with cervical epidural steroid injection. (TR 114).

On May 27, 2003 Plaintiff complained of worsening pain in his neck and lower back and "radiating down the right lower extremity associated with numbness and tingling." (TR 98). The same day, Plaintiff had an examination of the lumbosacral spine with obliques, five views. (TR 100). This was reviewed by radiologist Babu Vemuri, M.D., who noted " [l]umbar vertebral bodies maintain normal height, alignment and interspacing without fracture or subluxation." He noted "early spur formation . . . at the margins of L4 and L5," "[p]edicals are seen intact" and "[a]pophyseal and sacroiliac joints are within normal limits." (TR 100). The studies were negative for any abnormalities in the lumbosacral spine. (TR 100).

The record contains Operative/Procedure Reports for the epidural steroid and nerve block injections performed by Robert R. Peleman, M.D., on March 26, 2003, April 10, 2003, April 28, 2003, June 5, 2003. (TR 117, 121, 123, 125, 171). Each time, Dr. Peleman noted that Plaintiff tolerated the procedure quite well. On April 7, 2003 Plaintiff indicated to Dr. Sharma that he noticed marked improvement in his symptoms following the cervical epidural steroid injection. (TR 103). Generally the epidural steroids resulted in a decrease in symptoms and pain however on April 28, 2003 Dr. Peleman noted that Plaintiff had suffered a "setback" in the last three to four days and

was "feeling a lot of pain" accompanied by interrupted sleep. (TR 121). On June 5, 2003 Dr. Peleman noted that Plaintiff had continually been having more severe pain and the "last epidural steroid was non-beneficial." (TR 117). On June 4, 2003 Dr. Sharma noted that he "reviewed the plain radiographs of the lumbar spine which reveals decreased disc space at L5-S1 with narrowing of the intervertebral foramina." (TR 97). On the same date he also noted that Plaintiff "will start outpatient physical therapy treatment focusing on modalities, pelvic traction, and spinal stabilization exercises. (TR 97). On June 5, 2003 Plaintiff also underwent a fluoroscopy under the direction of Dr. Peleman. (TR 119). The fluoroscopy revealed fusion of C3 and C4 as well as C5 and C6. (TR 119). The radiologist, James Denier, M.D., noted "[c]ervical fusion has been performed. Cervical fusion is well established with osseous ankylosis about the fused segments. There is no evidence of underlying acute fracture." (TR 119).

On June 26, 2003 Kuldip S. Deogun, M.D. performed his initial evaluation of Plaintiff. (TR 158). Dr. Deogun diagnosed degenerative lumbar disk disease and cervical spondylosis. (TR 159). He noted that Plaintiff was on medications OxyContin, Duragesic patch, Paxil, Klonopin and Zocor. (TR 158). He noted that Plaintiff suffered a fall approximately six weeks prior and there were no problems prior to the fall, however Plaintiff had a history of neck problems since 1999. (TR 158). Dr. Deogun noted a restricted range of motion in the neck with "an increase in pain with tenderness in the midline and paravertebral areas, more so on the right side." (TR 159). Dr. Deogun described Plaintiff's gait as "limping" and his appearance as "[i]n moderate discomfort." (TR 158).

The record contains an unsigned, undated, partially completed disability form which the ALJ in his decision notes was sent to Dr. Deogun. (TR 20, 161-165). The responses on the form indicate that Plaintiff is able to walk, walk on heals and toes and get on and off the examining table. (TR

162). It indicates that squatting and climbing stairs are "difficult." (TR 162). It indicates that Plaintiff's right handed grip strength is weaker than the left and he has a loss of dexterity but no loss of strength. (TR 163). The form states that Plaintiff is "unable to sit for any length of time to work at computer." (TR 163). The ALJ did not give weight to this form because it is not dated or signed and it is incomplete. (TR 20).

A Mental Impairment Development Form dated February 17, 2004 indicated that a "PRTF" was not necessary because "No mental impairment alleged and no functional limitations (ascertained from ADL forms)." (TR 77). The examiner noted that Plaintiff is prescribed Zoloft by the physician providing Plaintiff's pain management. (TR 77). The examiner also noted that Plaintiff's "[d]iscomfort causes difficulty paying attention" and the medication causes poor memory. (TR 77). However, Plaintiff "is capable of caring for personal needs, drive, (sic) and attend social events." (TR 77).

On February 2, 2005 Dr. Deogun performed diagnostic right sacroiliac joint injections with fluoroscopic assistance on Plaintiff. (TR 173). Plaintiff had been complaining of "pain in the right hip and buttock that radiates down the leg." (TR 173). On July 12, 19 and 26, 2005 Plaintiff underwent trial intrathecal injections to assess efficacy and effective dosage prior to inserting an intrathecal pump. (TR 176, 177, 178).

John A. Dooley, Ph.D., licensed psychologist, performed a psychological evaluation on Plaintiff on July 28, 2005. (TR 166). The psychological evaluation was requested to determine whether any psychological factors exist that would complicate Plaintiff's ability to respond to the implant of an intrathecal analgesic pump. (TR 167). Dr. Dooley observed that Plaintiff was able to rise from his chair, ambulate to the office and sit through the evaluation without overt difficulty.

(TR 166). Plaintiff complained of constant neck pain radiating to both upper extremities and persistent lower back pain. (TR 166). Dr. Dooley noted that Plaintiff's "responses to questions were cogent and goal-directed," there were "no indications of any psychotic process in spontaneous speech" and the "content of his verbalizations was not restricted solely to his pain, although this was presented in a frustrated manner." (TR 166). Dr. Dooley noted that Plaintiff reported "a history of excessive alcohol use, but this has not been a problem for many years." (TR 167). Plaintiff reported that he has some difficulty taking stairs to the basement in his home, however he is independent in activities of daily living. (TR 168). His daily activities are limited due to pain, but he is able to complete light housework, cooking and laundry. (TR 168). He assists his parents by taking them to appointments and running errands and he is still able to do some fishing and hunting. (TR 168). He has curtailed participation in archery and he walks daily. (TR 168). Dr. Dooley further noted that Plaintiff reported some "difficulties with depression" and frustration when his pain interferes, as it has with sleep and intimacy. (TR 168). Dr. Dooley found that, consistent with Plaintiff's presentation, "testing indicated moderate overall difficulties." (TR 169). Plaintiff reports moderate difficulties with body care and movement and severe difficulties with ambulation. (TR 169). Dr. Dooley diagnosed mild Adjustment Disorder with Mixed Emotional Features. (TR 169). Dr. Dooley reported that "[t]here are no current indications of medication abuse, environmental reinforcement for disability, a somatizing process, or malingering." (TR 169). Dr. Dooley concluded that there were "no overt psychological contraindications to implantation of the intrathecal pump." (TR 170).

On September 16, 2005 Plaintiff underwent insertion of the permanent intrathecal catheter and pump with fluoroscopic assistance by Dr. Deogun. (TR 171). Plaintiff had had an intrathecal

-8-

catheter installed the prior year in July 2004 without success. (TR 128). The prior intrathecal catheter was removed after Plaintiff suffered nausea and vomiting as a result of the intrathecal morphine. (TR 128). The second catheter and pump, inserted in September 2005 was successful. "The pump was programmed to deliver 0.5 milligrams of Dilaudid on a daily basis." (TR 172). On October 5, 2005 Plaintiff underwent a follow-up visit for the pump. (TR 174). Plaintiff noted that his pain relief was "adequate" and that the pain level with medication was at a 3 of 10. Plaintiff further noted that the following areas had "improved": ability to work around the house, mood, overall quality of life, pain level, relationship with others and sleep. (TR 174). Plaintiff noted that his ability to tolerate the pain level had "much improved." (TR 174).

## ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although the Plaintiff met the disability insured status requirements through December 31, 2008, had not engaged in substantial gainful activity since his alleged onset date, suffered from osteoarthritis of the lumbar spine, a history of sacroiliitis and a piriformis syndrome, history of two cervical fusions and a history of alcohol abuse in long-term remission, all severe impairments, he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments (TR 17-18). The ALJ found Plaintiff's assertions regarding the intensity, duration and limiting effects of his medical symptoms not entirely credible and that his allegations of physical and mental limitations were out of proportion to the objective evidence. (TR 19). The ALJ concluded that Plaintiff has the residual functional capacity to perform a limited range of skilled sedentary work with specific functional limitations and is capable of performing his past relevant work as a field custody investigator. (TR 18, 20).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this court to try cases *de novo*, or resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts").

## DISCUSSION AND ANALYSIS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his RFC, age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *Id*. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id*. (citations omitted).

Plaintiff contends that the government's vocational expert (VE), Christian Barrett, Ed.D., found that Plaintiff was "unfit" for work and that the ALJ did not give proper weight to this opinion. Therefore, Plaintiff contends that the ALJ's decision was arbitrary and capricious and not supported

by the evidence. Pl's Br. at 2. As shown above, the standard is whether the ALJ's decision is supported by substantial evidence.

The VE stated Plaintiff's age as "[a] person approaching advanced age." (TR 213). The VE further testified that Plaintiff's education category is high school plus two years of college. (TR 213). The VE stated that Plaintiff's prior work "as a field custody investigator is skilled work, and it's performed at a light exertional level." (TR 214). The ALJ asked the VE whether a person of Plaintiff's age, education and work experience with an exertional limitation of

> [L]ifting to 10 pounds occasionally, 5 pounds frequently with the additional limitations of no climbing ladders, ropes or scaffolds, occasionally climbing ramps and stairs, occasionally balancing, stooping, crouching, kneeling and crawling, and also limitations that (sic) providing for jobs that do not require constant head movements, and again putting this individual at the skill level could such a person be expected to perform Claimant's past relevant work?

(TR 214). To which the VE responded, "Yes." (TR 214).

The ALJ found that Plaintiff

> [H]as the residual functional capacity to perform a limited range of skilled sedentary work, as sedentary is defined in the Regulations, with the following specific functional limitations: can lift and carry 5 pounds frequently, 10 pounds occasionally; is entirely precluded from climbing scaffolds/ropes/ladders; can perform all other postural activities (climbing stairs/ramps, stooping, crouching, balancing, kneeling, and crawling) occasionally; cannot perform jobs that require constant head movements.

(TR 18).

"Sedentary" work is defined in the Regulations as work that

> [I]nvolves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a). The ALJ found that Plaintiff can perform work at a "sedentary" exertion level and concluded that Plaintiff can perform his past relevant work. However, the ALJ also noted that the VE testified that Plaintiff's past work was "skilled in nature and medium in exertion." (TR 20). The VE's testimony in the transcript was that the Plaintiff's past relevant work "as a field custody investigator is skilled work, and it's performed at a *light* exertional level." (TR 214) (emphasis added). Therefore, the ALJ's finding that the Plaintiff can perform his past relevant work is not supported by substantial evidence in the record and it is not supported by the VE's testimony. It is inconsistent with the VE's testimony that Plaintiff's past work was "light" in exertion. Furthermore, a conclusion that Plaintiff can perform his past relevant work, at *either* a light *or* medium exertion level, is inconsistent with a conclusion that Plaintiff can perform at a sedentary exertion level.

Under the regulations, "[i]f someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c). However, if someone can do sedentary work, there is no provision that allows them to perform work at a higher level of exertion, such as light or medium exertion. Therefore, the ALJ's finding that Plaintiff can perform sedentary work is inconsistent with the evidence in which the ALJ states that the VE found Plaintiff's past relevant work to be of medium exertion, and the VE's testimony that Plaintiff's past relevant work is of light exertion.

The ALJ also asked the VE to consider "if I find Claimant's testimony to be credible and the exertional impairments described are supported by the medical evidence, would there be any jobs

that the person could perform?" The VE responded that "based on the Claimant's description of his capacity to sit, stand, walk and lift, I believe he'd be limited to sedentary occupations." (TR 215).

Later in the hearing the ALJ asked the VE, "And if we consider Claimant's non-exertional limitations, can the Claimant do any work?" The VE responded, "I don't believe so, no, Your Honor." When asked for an explanation the VE further responded that "[t]he frequency and severity of the pain that he describes in both the neck and back, the deficits in concentration and focus, the numbness in his arms and hands, these factors in combination I believe would preclude an individual from sustaining any type of purposeful activity sufficient to complete a work day or work week." (TR 217).

Plaintiff relies on this line of questioning for its premise that the VE testified as to Plaintiff's credibility and found that Plaintiff was unable to perform any work. However, determinations of credibility are not for the VE. They are left to the ALJ. The ALJ found that the Plaintiff's statements and testimony were not entirely credible. The ALJ's conclusions regarding credibility should be accorded deference and should not be discarded lightly because the ALJ has the opportunity to observe the demeanor of a witness. *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1234 (6th Cir. 1993).

A finding that a claimant is not credible must be supported by substantial evidence in the same manner as any other ultimate factual determination.

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

. . . The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.

Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34485-86 (1996). The assessment must be based on a consideration of all of the evidence in the case record, including

Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34485-86 (1996).

On the other hand, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). In addition to the available objective medical evidence, the ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Here, the ALJ found

After considering the evidence of record, the undersigned finds that Claimant's medically determinable impairments could reasonably be expected to produce the type of alleged symptoms, but that Claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.

(TR 18). The ALJ discussed specific instances in which the claimant's allegations were inconsistent with the medical record and concluded that, "[a]fter considering the above factors, it is concluded that Claimant's allegations of physical and mental limitations are out of proportion to the objective evidence. He was quite active both socially and physically prior to the implantation, despite his allegations of significant pain. At the hearing, there was no sign of impaired concentration." (TR 19).

The ALJ noted that progress notes from 2002 and 2003 revealed that Plaintiff "obtained relief from his medications and was able to engage in his normal activities." (TR 18, 96-114). The ALJ further noted that in May 2003 Plaintiff complained of lower back pain radiating into his right lower extremity. (TR 19). An MRI and radiological studies performed shortly thereafter in May 2003 did not reveal any abnormalities. (TR 19, 100, 120). Likewise, an EMG examination on June 3, 2003 did not show electrodiagnositic (sic) evidence of lumbosacral radiculopathy. (TR 19, 97). The ALJ also noted that in response to the first intrathecal morphine pump that was implanted in July 2004 Plaintiff had an adverse reaction to the medication including nausea and vomiting and the pump was removed. (TR 19, 128-29). The ALJ points out, however that "there is no evidence to show that he has significant side effects to his oral medications." (TR 19). The ALJ noted that [a]ccording to the available evidence, [Plaintiff] has done well with the second pump implantation." (TR 19, 171-72, 174).

Finally, the ALJ noted findings in Dr. Dooley's report that indicated that Plaintiff's allegations were out of proportion with the objective evidence. Plaintiff reported to Dr. Dooley in

his psychological evaluation in July 2005 that Plaintiff "continued to engage in some fishing and hunting, walked daily, assisted his parents in running errands, cooked, and did laundry. He stated that he had scaled back in his more strenuous recreation activities, such as archery." (TR 19, 168). "Dr. Dooley's psychological report indicated that despite complaints of debilitating pain that interfered with his day to day functional activities, including problems with sleep, recreational pursuits, and the ability to maintain occupational functioning, Claimant continued to have an active lifestyle, engaging in a wide range of activities, even after restricting himself from more strenuous activities such as archery." (TR 19). There is substantial evidence in the record supporting the ALJ's conclusions about Plaintiff's credibility.

Plaintiff appears to allege that the ALJ ignored evidence provided by Plaintiff that would establish an impairment or combination of impairments that meets or exceeds the Listings, however, Plaintiff does not cite specific evidence which would establish an impairment under the Listings.

Plaintiff also generally alleges that the ALJ did not give proper weight to the treating physicians' opinions. It is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference. Under 20 C.F.R. § 404.1527(d)(2), the ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The ALJ's decision relies on medical records and opinions of Plaintiff's treating physicians. To the extent that the ALJ determined that a particular medical questionnaire in the record is not entitled to controlling weight, the ALJ properly noted that the form is undated and unsigned, although presumably from Dr. Deogun. The ALJ further found that the statements in the form regarding Plaintiff's ability to work at a computer appear to "reflect a subjective

complaint" and are not based upon objective clinical or diagnostic findings. (TR 20, TR 161-65).

The Plaintiff's argument that the ALJ made a "medical decision" is not persuasive. The ALJ properly makes the determination of the claimant's residual functional capacity. Although it is proper for the ALJ to give a treating physician's opinion controlling weight in accordance with the Social Security Administration Regulations, the Regulations do not afford the same deference to opinions on an issue reserved to the Commissioner, such as a final determination of "disabled" or "unable to work." Dispositive administrative findings relating to the determination of a disability are within the purview of the Commissioner.

(e) . . . Opinions on some issues, . . . are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

. . .

(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section.

20 C.F.R. 404.1527(e). The ALJ properly made administrative findings based on the evidence in the record.

Plaintiff argues that the ALJ's mention in its decision that Plaintiff had a "history of alcohol abuse in long-term remission" was an attempt to discredit Plaintiff. (TR 17). Under 42 U.S.C. 423 (d)(2)(C) and 20 C.F.R. 404.1535(b)(1) the ALJ is required to make a determination about whether alcoholism or drug addiction is a contributing factor to a disability determination. To the extent that this evidence appeared in the record, the ALJ was required to weigh it. (TR 158, 167). The ALJ did not mention it to "discredit" Plaintiff.

Finally, Plaintiff included additional evidence in its application to the Appeals Council. "The court is confined to review evidence that was available to the Secretary, and to determine whether the decision of the Secretary is supported by substantial evidence." *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Where a party presents new evidence on appeal, this court can remand for further consideration of the evidence only where the party seeking remand shows that the new evidence is material." *Id.* citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 553-54 (6th Cir. 1984). "Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial." *Id.* citing *Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 712 (6th Cir. 1988). Plaintiff submitted a report by Donald Seyfried, M.D., dated May 4, 2006 for an examination the same day. (TR 182). This evidence was not before the ALJ and the new evidence is not material to the Plaintiff's condition as of the onset date, the hearing date or the date of the ALJ's decision. Plaintiff has not shown that this information is material. Therefore, the case is not remanded for further consideration of this evidence.

The ALJ's finding that Plaintiff has the exertional capacity to perform sedentary work is inconsistent with his finding that Plaintiff is capable of performing his past relevant work that is

"medium" in exertion. Furthermore, the ALJ's finding that the VE testified that Plaintiff's past relevant work was "medium" in exertion is not supported by the record. The VE testified that Plaintiff's past relevant work was "light" in exertion. (TR 214). The ALJ's finding was not supported by substantial evidence and therefore the Court recommends remanding the instant action so that the ALJ may re-evaluate its findings related to Plaintiff's exertional capacity and the exertion required for Plaintiff's past relevant work. If such an analysis alters the ALJ's determination that the Plaintiff is capable of performing his past relevant work, the ALJ must proceed at step five of the evaluation process to determine whether Plaintiff is able to do any other work considering his residual functional capacity, age, education and work experience. Accordingly, both Plaintiff's and Defendant's Motions for Summary Judgment should be denied and the instant case remanded for further proceedings consistent with this report and recommendation.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of*

*the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: September 27, 2007        s/ Mona K. Majzoub
                                             MONA K. MAJZOUB
                                             UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: September 27, 2007        s/ Lisa C. Bartlett
                                             Courtroom Deputy